*85 ORDER (Final Judgment)
AMANDA L. ROCKMAN, Associate Judge.
INTRODUCTION
On November 11, 2006, the General Council removed President George Lewis pursuant to General Council Resolution 11-11-06A. The General Council based his removal on charges attached to the Notice to Remove from Office. The plaintiff sought a preliminary injunction to enjoin the defendants from further acting upon the resolution. The Tidal Court granted the injunction. See Lewis v. HCN Election Bd. et al, CV 06-109, 6 Am. Tribal Law 354, 2006 WL 5891105 (HCN Tr. Ct, Dec. 5, 2006). The Supreme Court remanded the instant case for proceedings consistent with the appellate decision. Lewis v. HCN Election Bd. et al, CV 06-07, 7 Am. Tribal Law 41, 47, 2007 WL 5256874 (HCN S.Ct. Mar. 12, 2007) at 9.
PROCEDURAL HISTORY
The Court recounts the procedural history in significant detail in its Order Granting Injunction (HCN Tr. Ct, Dec. 5, 2006). The Supreme Court remanded the instant case for proceedings consistent with the appellate decision. Sherry Wilson v. HCN Dep't of Pers., SU 06-01, 6 Am. Tribal Law 184, 185, 188, 2006 WL 5771816 (HCN S.Ct, Sept. 21, 2006) at 1, 6. On December 5, 2006, the Trial Court granted the President Lewis’ request for a Preliminary Injunction. George Lewis v. HCN Election Bd. et al., CV 06-109 Order (Granting Inj.), 6 Am. Tribal Law 354, 372, 2006 WL 5891105 (HCN Tr. Ct, Dec. 5, 2006) at 25.
*86 The defendant, Francis Decorah, General Council Chairperson of the November 11, 2006 General Council, by and through Attorney John Swimmer, tiled an Interlocutory Appeal with the Ho-Chunk Nation Supreme Court on December 16, 2006. On January 15, 2007, the defendant filed a Notice and Motion for Stay of the Trial Court Scheduling Order and Further Proceedings Pending the Outcome of the Interlocutory Appeal, asking that the current action be placed on hold until a decision could be rendered by the Supreme Court. The plaintiff filed an Objection to Defendant’s Motion for a Stay of Proceedings on January 18, 2007. This Court did not grant the stay based upon the Supreme Court’s prior ruling denying the stay at the appellate level. See George Lewis v. Francis Decorah, SU 06-07 (HCN S.Ct., Jan. 29, 2007).
On March 12, 2007, the Supreme Court issued its decision. The conclusion section of that decision stated:
the Trial Court committed error by substituting its judgment as to what constituted malfeasance in the removal of a President pursuant to the Ho-Chunk Nation Constitution. Our Constitution gives the General Council the paramount role in determining what constitutes malfeasance and political office holders ignore its authority at their own peril. This case is reversed and remanded with instructions to dissolve the injunction and to expedite resolution of any remaining issues of the Appellee on remand.
George Lewis v. HCN Election Board et al., SU 06-07 Decision, 7 Am. Tribal Law 41, 47, 2007 WL 5256874 (HCN S.Ct., Mar. 12, 2007) at 9. On March 7, 2007, at 1:00 p.m. CDT, the Court convened a Pre-Trial Conference. The following parties appeared at the Conference: Attorney Glenn C. Reynolds for the plaintiff, Attorney Paul Stenzel for the defendants, and Attorney John Swimmer for the defendant, all appearing telephonically. On the same date, the plaintiff filed an Amended Plaintiffs Preliminary Witness List, with the required proof of service.
The Court convened Tnal on March 19, 2007, and again on March 20, 2007 at 8:00 a.m. CDT. The following parties appeared at the Trial: Attorney Glenn C. Reynolds for the plaintiff, Attorney Paul Stenzel for the defendants, and Attorney John Swimmer for the defendant. The following persons testified at the Trial: George Lewis, the plaintiff; Francis Decorah, Chairman of the November 11, 2006 General Council; Faye Begay; Thomas Hopinkah; Richard Mann; Tara Swallow, General Council Agency Vice Chair; and Wilfrid Cleveland, General Council Agency District 1 Agent.
APPLICABLE LAW
CONSTITUTION OF THE HO-CHUNK NATION
Art. IV—General Council
Sec. 1 Powers of the General Council. The People of the Ho-Chunk Nation hereby grant all inherent sovereign powers to the General Council. All eligible voters of the Ho-Chunk Nation are entitled to participate in General Council.
Sec. 2 Delegation of Authority. The General Council hereby authorizes the legislative branch to make laws and appropriate funds in accordance with Article VI. The General Council hereby authorizes the judicial branch to interpret and apply the laws and Constitution of the Nation in accordance with Article VII.
Sec. 3. Powers Retained by the General Council.
(d) The General Council retains the power to establish its own procedures in accordance with this Constitution.
*87 (f) Actions by the General Council shall be binding.
Art. VII—Judiciary
Sec. 4. Powers of the Judiciary. The judicial power of the Ho-Chunk Nation shall be vested in the Judiciary. The Judiciary shall have the power to interpret and apply the Constitution and laws of the Ho-Chunk Nation.
Art. IX—Removal, Recall and Vacancies
Sec. 1. General Council Removal of Legislators. The General Council may remove any member of the Legislature for malfeasance. No vote by the General Council to remove a member of the Legislature shall take place before such Legislator has been given reasonable notice of the impending action and has had a reasonable opportunity to be heard.
Sec. 2. General Council Removal of the President. The General Council may remove the President for malfeasance. No vote by the General Council to remove the President shall take place before such President has been given reasonable notice of the impending action and has had a reasonable opportunity to be heard.
Art. X—Bill of Rights
Sec. 1. Bill of Rights.
(a) The Ho-Chunk Nation, in exercising its powers of self-government, shall not:
(8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without the due process of law
UNITED STATES CONSTITUTION
Art. I
Sec. 2(5). The House of Representatives shall choose their Speaker and other Officers; and shall have the sole Power of Impeachment.
Sec. 3(6). The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present.
Art. II
Sec. 4. The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.
Art. Ill
Sec. 1. The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their- Offices during good Behavior, and shall, at stated Times, receive for their Services a Compensation, which shall not be diminished during their Continuance in Office.
Sec. 2(3). The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.
Sec. 3(1) Treason against the United States shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.
*88 HO-CHUNK NATION RULES OF CIVIL PROCEDURE
Rule 5. Notice of Service of Process.
(A) Definitions.
(2) Summons—The official notice to the party informing him/her that he/she is identified as a party to an action or is being sued, that an Answer is due in twenty (20) calendar days (See HCN R. Civ. P. 6) and that a Default Judgment may be entered against them if they do not file an Ansiver in the prescribed time. It shall also include the name and location of the Court, the case number, and the names of the parties. The Summons shall be issued by the Clerk of Court and shall be served with a copy of the filed Complaint attached.
(C) Methods of Service of Process
(1) Personal Service. The required papers are delivered to the party in person by the bailiff, or when authorized by the Court, a law enforcement officer from any jurisdiction, or any other person not a party to the action who is eighteen (18) years of age or older and of suitable discretion.
(a) Personal Service is required for the initiation of actions in the following:
(i) Relief requested is over $5,000.00, excluding the enforcement of foreign child support orders....
(e) Service by Mail. Service of process may be accomplished by sending the required papers to a party by registered mail with return receipt requested, except in the instances of Rule 5(C)(1)(a)(i) ... as stated above.
Rule 27. The Nation as a Party.
(B) Civil Actions. When the Nation is filing a civil suit, a writ of mandamus, or the Nation is named as a party, the Complaint should identify the unit of government, enterprise or name of the official or employee involved. The Complaint, in the case of an official or employee being sued, should indicate whether the official or employee is being sued in his or her individual or official capacity. Service can be made on the Ho-Chunk Nation Department of Justice and will be considered proper unless otherwise indicated by these rules, successive rules of the Ho-Chunk Nation Court, or Ho-Chunk Nation Law.
Rule 43. Pre-Trial Conference.
The Court may hold conferences with the parties, or their counsel when the party is represented. Notice of the time, place and purposes must be given far enough in advance to allow all parties to attend. The purposes of a conference may be to foster a resolution of the action without trial; to schedule discovery, motions and hearings to expedite the action; and to formulate a plan for the trial, identifying witnesses to be called, evidence to be presented, unresolved factual and legal issues, and for discussion of any other matter among the parties. A party may be sanctioned for failing to attend a conference if they received at least ten (10) calendar days notice and do not show good cause for failing to attend.
Rule 53. Relief Available.
Except in a Default Judgment, the Court is not limited to the relief requested in the pleading and may give any relief it deems appropriate. The Court may only order such relief to the extent allowed by Ho-Chunk Nation enactments. The Court may order any party to pay costs, including attorney’s fees, filing fees, costs of service and discovery, jury and witness costs. Findings of fact and conclusions of law shall be made by the Court in support of all final judgments.
Rule 58. Amendment to or Relief from, Judgment or Order.
(A) Relief from Judgment. A Motion to Amend or for relief from judgment, includ *89 ing a request for a new trial shall be made within ten (10) calendar days of the filing of judgment. The Motion must be based on an error or irregularity which prevented a party from receiving a fair trial or a substantial legal error which affected the outcome of the action.
(B) Motion for Reconsideration. Upon motion of the Court or by motion of a party made not later than ten (10) calendar days after entry of judgment, the Court may amend its findings or conclusions or make additional findings or conclusions, amending the judgment accordingly. The motion may be made with a motion for a new trial. If the Court amends the judgment, the time for initiating an appeal commences upon entry of the amended judgment. If the Court denies a motion filed under this rule, the time for initiating an appeal from the judgment commences when the Court denies the motion on the record or when an order denying the motion is entered, whichever occurs first. If within thirty (30) days after the filing of such motion, and the Court does not decide a motion under this Rule or the judge does not sign an order denying the motion, the motion is considered denied. The time for initiating an appeal from judgment commences in accordance with the Rules of Appellate Procedure.
(C) Motion to Modify. After the time period in which to file a Motion to Amend of a Motion for Reconsideration has elapsed, a party may file a Motion to Modify with the Court. The Motion must be based upon new information that has come to the party’s attention that, if true, could have the effect of altering or modifying the judgment. Upon such motion, the Court may modify the judgment accordingly. If the Court modifies the judgment, the time for initiating an appeal commences when the Court denies the motion on the record or when an order denying the motion is entered, whichever occurs first. If within thirty (30) calendar days after the filing of such motion, and the Court does not decide the motion or the judge does not sign an order denying the motion, the motion is considered denied. The time for initiating an appeal from judgment commences in accordance with the Rules of Appellate Procedure.
(D) Erratum Order or Reissuance of Judgment. Clerical errors in a court record, including the Judgment or Order, may be corrected by the Court at any time.
(E) Grounds for Relief. The Court may grant relief from judgments or orders on motion of a party made within a reasonable time for the following reasons: (1) newly discovered evidence which could not reasonably have been discovered in time to request a new trial; or (2) fraud, misrepresentation or serious misconduct of another party to the action; or (3) good cause if the requesting party w[7]as not personally served in accordance with Rule 5(c)(l)(a)(i) or (ii); did not have proper service and did not appear in the action; or (4) the judgment has been satisfied, released, discharged or is without effect due to a judgment earlier in time.
Rule 61. Appeals.
Any final Judgment or Order of the Trial Court may be appealed to the Supreme Court. The Appeal must comply with the Rules of Appellate Procedure, specifically Rules of Appellate Procedure, Rule 7, Right of Appeal. All subsequent actions of a final Judgment or Trial Court Order must follow the Rides of Appellate Procedure.
FINDINGS OF FACT
1. The parties received proper notice of the March 19-20, 2007 Trial.
*90 2. The Court incorporates by reference Findings of Fact 1-25 as enumerated in a previous decision. Order (Granting Inf ), CV 06-109 (Dec. 5, 2006) at 11-15.
3. Due to the limited number of items accepted to the agenda, President Lewis was permitted ten (10) to twelve (12) minutes to answer the charges against him, accomplished primarily by reading his written statement. Tr. (LPER, at 17, Mar. 20, 2007, 09:27:10-09:31:38 CDT); Prelim. Inf Hr‘g (LPER, at 7, 10, Nov. 27, 2006, 09:18:35, 09:29:04 CST).
4. President Lewis did not call witnesses to support his account of the items listed within the Notice of Intent to Remove from Office.
5. President Lewis provided a number of documents to General Council secretaries Diane LoneTree and Judy Whitehorse. Tr. (LPER, at 32, Mar. 19, 2007, 10:55:07-10:55:32 CDT; at 10, Mar. 20, 2007, 08:36:04-08:38:07 CDT). However, he never asked the secretaries to place these papers on the projector screen, nor make copies for the General Council participants. Tr. (LPER, at 12, 18-19, Mar. 20, 2007, 08:49:20-08:50:30, 09:36:50-09:38:53 CDT). The following documents were provided to the secretaries:
a. President George Lewis Response to Notice of Intent to Remove from Office
b. Ho-Chunk Nation Department of Justice Contract Routing Sheet
c. October 27, 2006 & November 10, 2006 Letters from SMP Communications Corporation (declaring the TERO fees were paid)
d. November 2, 2006 Memorandum of Law from Attorney Scott Sussman to Vice President Wade Blackdeer re: Analysis of contract between SMP and Ho-Chunk Nation
e. HCN Legislature Resolution 5// 11/99-J Contract Administration Responsibility
f. HCN Legislature Resolution 7/15/97-C Signature Authority for Contracts Entered Into on Behalf of the Ho-Chunk Nation
Pl.’s Tr. Ex. 5.
5. Mr. Richard Mann testified that there were children were running all around, people were chasing after children, other people were roaming all over, and then there those that were visiting with others that they had not seen in awhile. For these reasons, people found it difficult to hear what was being said during General Council. Tr. (LPER, at 40, 50, Mar. 19, 2007, 11:20:34-11:21:53, 12:36:02-12:37:42 CDT).
6. Mr. Thomas Hopinkah testified that there were poor acoustics in the La Crosse Center, the projector screens were placed in positions that made it difficult to view them, that it was difficult to hear people at the podiums as many of them mumbled, and that the entire event reminded him of “a kangaroo court, or helter-skelter ... mayhem.” Tr. (LPER, at 40, Mar. 19, 2007, 12:36:02-12:37:42 CDT).
7. Ms. Faye Begay testified that she had a resolution regarding Ho-Chunk children that she wished to present, but was told that she would have wait until the next General Council. Tr. (LPER, at 36-37, Mar. 19, 2007, 11:08:36-11:10:58 CDT). In addition, she testified that she felt that there was no chance to speak on the subject of President Lewis’ removal because motions were being made and passed so fast, that she said there was no time. Id, at 37-38, 11:13:20-11:13:58. Furthermore, Ms. Begay spoke how there was no information disseminated prior to General Council, so no one knew what was going on, and because of how fast things were proceeding there was no time to educate *91 oneself on what was occurring. Id,, at 38, 11:14:04-11:16:46.
8. After President Lewis’ ten (10) to twelve (12) minutes, he stated to the audience that if they wanted to vote, then he would call for the question. PL ⅛ Post-Tr. Br. on Due Process at 5; Tr. (LPER, at 19, Mar. 20, 2007, 09:38:63-09:39:21 CDT).
9. A motion was presented approving President Lewis’ removal, which was seconded, and then a call for the question was made. After this a vote was taken. Tr. (LPER, at 33, Mar. 19, 2007, 10:59:09-10:59:54 CDT).
10. Of the voting members present, 584(59%) voted for removal, 341(39%) voted against removal, and 71 members (7%) abstained from the vote. Chairman Deco-rah noted the resolution passed. See PL ⅛ Br. at 3.
11. Following President Lewis’ removal, Vice President Wade Blackdeer was elevated to the position of pro tempore President, as required by the CONSTITUTION. See CONST, ART. IX, § 9(b).
DECISION
On November 11, 2006, the General Council removed President George Lewis pursuant to General Council Resolution 11-11-06A. The General Council based his removal on malfeasance regarding charges attached to the Notice to Remove from Office. The plaintiff sought a preliminary injunction to enjoin the defendants from further acting upon the resolution. The Trial Court granted the injunction. See Lewis v. HCN Election Bd. et al, CV 06-109, 6 Am. Tribal Law 354, 2006 WL 5891105 (HCN Tr. Ct., Dec. 5, 2006). The Supreme Court remanded the instant case for proceedings consistent with the appellate decision. Lewis v. HCN Election Bd. et al, CV 06-07, 7 Am. Tribal Law 41, 47, 2007 WL 5256874 (HCN S.Ct., Mar. 12, 2007) at 9. The Court declined to review' the merits of the “malfeasance” charge because the appellate court specifically stated
this Court concludes the Trial Court committed error by substituting its judgment as to what constituted malfeasance in the removal of a President pursuant to the HO-CHUNK NATION CONSTITUTION. Our Constitution gives the General Council the paramount role in determining wrhat constitutes malfeasance and political office holders ignore its authority at their own peril. This case is reversed and remanded with instructions ... to expedite resolution of any remaining issues of the Appellee on remand.
Lewis v. HCN Election Bd., SU 06-07, 7 Am. Tribal Law 41, 47, 2007 WL 5256874 (HCN S.Ct, Mar. 12, 2007) at 9.
The holding within the appellate decision first appears on page five (5) of the opinion. Therein, “[t]he Supreme Court holds ... that the issue of whether a political office holder has a right to challenge whether or not he or she has committed malfeasance is up to the General Council in the first instance.” Leans v. HCN Election Bd. et al, SU 06-07, 7 Am. Tribal Law 41, 45, 2007 WL 5256874 (HCN S.Ct, Mar. 12, 2007) at 5. Within the same paragraph, the Supreme Court notes that this conclusion coincides with statements made in a prior presidential removal case in which it held that the Judiciary “will not examine the substance of the charges of malfeasance as those are up to the General Council in the first instance.” Id, (citing Jacob LoneTree et al. v. Robert Funmaker, Jr. et al., SU 00-16 (HCN S.Ct., Mar. 16, 2001)).
The seemingly relevant discussion in LoneTree is as follows: “[t]he Trial Court held that the General Council need not define the term ‘malfeasance.’ ... It wras *92 not error for the Trial Court judge to refuse to review the General Councils [sic] decision that Mr. LoneTree’s actions constituted malfeasance.” LoneTree, SU 00-16 at 8. However, the Supreme Court’s brief synopsis of the underlying opinion, and its holding, proves inaccurate. The Trial Court, former Chief Judge Mark D. Butterfield presiding, addressed former President Jacob H. LoneTree’s invitation to evaluate the substance of the malfeasance charges not by abandoning its authority to interpret constitutional provisions, but by affording proper deference to the political decisions of a co-equal branch of government. LoneTree, CV 00-105 (HCN Tr. Ct., Dec. 12, 2000) at 11; see also HCN CONST., ART. IV, § 2 (identifying the General Council’s conferral of authority upon the Judiciary to interpret the constitutional text).
In LoneTree, the Trial Court refused to “weigh in and judge matters, such as the substance of malfeasance allegations that are primarily political matters.” LoneTree, CV 00-105 at 11. The Court continued: “[a]s ... held in Coalition for Fair Government II, so long as the allegations of malfeasance state to a reasonable tribal member some wrongful act, which meets a reasonable view of wrongful conduct, it is not for the Court to undo it.” Id. (citing Coalition for Fair Gov’t II v. CMoris A. Lowe, Jr., as Chairperson of Apr. 27, 1996 Gen. Council, et al., CV 96-22 (HCN Tr. Ct., May 21, 1996) at 13) (“[T]he issue of whether a Legislator has committed malfeasance is up to the General Council to decide....”). Nonetheless, the Court emphasized that the “wrongful act” must “pass the minimum threshold level to constitute malfeasance.” Id.
In Coalition for Fair Gov’t II, the Court, former Chief Judge Mark D. But-terfield presiding, offered in dicta a general definition of “malfeasance,” which constituted the minimum threshold. Coalition for Fair Gov’t II, CV 96-22 at 17. In this regard, the Trial Court’s characterization of its earlier opinion is in error since the holding in Coalition for Fair Gov’t II revolved around minimum procedural due process as acknowledged in the recent appellate decision. Lewis, SU 06-07 at 4, 7 Am. Tribal Law at 44, 2007 WL 5256874. Regardless, the LoneTree Court did not distance itself from the analysis performed four and one-half (4½) years earlier. The Court instead noted its reluctance of reviewing the sufficiency of the General Council’s malfeasance determination, explaining “[t]hat is why this court adopts a low threshold standard, which allows the members at General Council to have maximum say over what constitutes malfeasance.” LoneTree, CV 00-105 at 11 n. 5.
In the present case, this Court articulated the minimum threshold that must be present to validate a removal for malfeasance, i.e., basically, a wrongful act. Lewis, CV 06-109 at 21, 6 Am. Tribal Law at 369, 2006 WL 5891105. In doing so, the Court clearly stated that “[t]he General Council has the authority to [sic] as to whether such acts constitute malfeasance.” Id. The Court accordingly intended to ascertain at trial whether the plaintiff arguably committed a wrongful act. The Court would have only considered overturning the General Council removal action in the event that the plaintiff demonstrably proved that no reasonable person could have conceivably deemed that the individual allegations constituted malfeasance.
A complete evidentiary analysis neither occurred nor was supposed to occur at the preliminary injunction stage. However, based upon the documentation in the record, the plaintiff, for example, could seemingly conclusively demonstrate that BMP Communications Corporation paid quarter *93 ly TERO fees. See SMP Communications Corp. correspondence (Nov. 10, 2006) (“[P]ayments have been made quarterly, and a complete accounting is available upon request.”). Similarly, the plaintiff' could seemingly conclusively demonstrate that vendor selection occurred after adhering to the three-bid process. See Contract Review Cover Sheet, HCN Dep’t of Justice (Aug. 2, 2006) (denoting compliance with the three-bid process). The above preliminary findings directly address and contradict two (2) of the four (4) allegations contained in the Notice of Intent to Remove from Office.
Hypothetically, if the removal notice included only the single allegation of nonpayment of TERO fees (because neither a proponent of removal nor the General Council has a burden of proving anything), and the plaintiff could show that such an allegation was unequivocally false, then would the removal decision stand? Under the current state of the law after entry of the appellate decision, the answer appears to be yes. The Supreme Court has foreclosed this avenue of inquiry, stating that “[fundamentally, the job of determining whether malfeasance has occurred is up to the branch of government entrusted to it, here the General Council not the Courts.” Lewis, SU06-07 at 5, 7 Am. Tribal Law at 45, 2007 WL 5256874.
The Supreme Court apparently adopted the reasoning articulated by defendant Francis M. Decorah, despite this individual possessing no conferred ongoing authority to speak on behalf of the General Council. The defendant characterized the removal process as follows: “[i]t is up to Mr. Lewis to persuade the People that his actions do not violate the Constitution, do not violate the policy.... [H]e has the burden to prove to the People that these allegations do not rise to the level of malfeasance and it is a popularity contest. He does show up there, once the allegations are put forth, and as long as there’s some validity, minimum validity to those allegations establishing] a possible violation of the Constitution, then it is up to the People to make a decision whether they like George Lewis or not.” Oral Argument (LPER at 9, Feb. 24, 2007, 11:18:22 CST). The defendant reasserted his reasoning at a later point in his Supreme Court oral argument, remarking that “there can never be a full judicial process for General Council, it’s an election, it’s a popularity contest, it’s the will of the People.” Id. at 10, 11:21:13 CST.
The Court cannot accept the former Chairperson’s assessment that the removal process has devolved into a mere popularity contest, but even the defendant admits that the removal charges must contain some degree of minimum validity. Similarly, the defendant earlier acknowledged that the General Council’s ability to determine the presence of malfeasance must comport with “some reasonable standard of action,” but fails to reference any constitutional basis for this proposition. Id, at 5, 11:09:42 CST. The defendant concluded by declaring that “the definition of malfeasance ... is what the General Council thinks it is,” yet added the proviso, “as long as they have brought forth some minimal standards that would appear to violate the Constitution.” Id. at 7, 11:14:15 CST.
At this point, the defendant’s argument and the Trial Court’s opinions in Lewis, LmeTree and Coalition for Fair Gov’t II all converge; each agree that the malfeasance charges must satisfy a minimum threshold. The problem then becomes: from where does this minimum threshold arise if the Constitution permits no judicial evaluation of whether removal charges meet the most basic definition of malfeasance? The Supreme Court decision, authored by Associate Justice Mark *94 D. Butterfield, cuts off any and all judicial recourse on this issue when it characterized the removal decision “as a binding political question best left to the electors of the Nation.” Lewis, SU 06-07, 7 Am. Tribal Law at 45, 2007 WL 5256874.
This conclusion represents a colossal change in this respected jurist’s perception of the law of removal. In 1996, the Trial Court surmised that “[t]he Courts have the responsibility of interpreting the Constitution. This is not the duty of the General Council. There can be no mistaking this.” Coalition for Fair Gov’t II, CV 96-22 at 8. Moreover, “[t]he exercise of judicial power by the General Council in the first instance would . .. violate the explicit ban on the General Council interpreting this Constitution.” Id. at 11 (citing HCN Const., Art. IV, § 3(b)). The Court consequently determined that “the issue of what ‘malfeasance’ means in a gross sense is something that Courts have the expertise to determine,” and discounted the suggestion that it lacked “judicially discoverable and manageable standards for resolving it.” Id. at 13 (citing Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).
The Court deemed that “[t]he wording [in the] Constitution of the Ho-Chunk Nation is clear even to those not sophisticated in the English language,” and, therefore, ascertained that “[t]he plain and unambiguous meaning of HCN Constitution, Art. IX, § 1 is that the removal of a Legislator can only be accomplished by the General Council due to ‘malfeasance’ as that term was commonly understood by the framers of the HCN Constitution.” Id. at 8-9. The Court criticized the defendants’ constitutional argument, which, ironically, closely resembles defendant De-corah’s. Specifically, “[t]he reasoning of the defendant that the General Council’s actions in interpreting the HCN Constitution use of the word ‘malfeasance’ is permissible and also that it is unreviewable because it is ‘binding’ is circular and unhelpful.” Id. at 12.
Ten (10) years later, however, the Supreme Court was persuaded by defendant Decorah’s nearly identical argument, and distinguished Coalition for Fair Gov’t on the following grounds: “that case came early on in the history of the Ho-Chunk Nation Courts barely a year after their formation and during the difficult time of the first implementation of the new 1994 HCN Constitution.” Lewis, SU 06-07, 7 Am. Tribal Law at 45-16, 2007 WL 5256874. This rationale proves unsatisfying, especially given the fact that the trial level LoneTree opinion cited Coalition for Fair Gov’t with approval in 2000, and subsequently the Supreme Court upheld the Trial Court decision in 2001. To reiterate, the Trial Court in LoneTree recognized the presence of a minimum threshold. Today, the minimum threshold has been effectively removed, which represents a derogation of the Judiciary’s express authority to interpret the constitutional text. I K A Const., Arts. IV, § 2, VII, § 4. No definítion of malfeasance exists or can exist since it now may remain in an indefinite state of flux. Furthermore, the Court cannot review this matter because it is deemed a political question and the General Council does not have to define the term “malfeasance.” Therefore, the Constitution, now, may read, “[t]he General Council may remove the President.” HCN Const., Art. IX, § 2. A defending official, President or otherwise, will and may never know the meaning of “malfeasance.”
This result follows from the Supreme Court’s designation of a challenge to a removal action as presenting a political question, which renders the matter non-justiciable. In effect, the Court cannot *95 adjudicate any such issue because no case or controversy exists, thereby depriving it of jurisdiction. Yet, the Supreme Court does not identify the entire process as non-justiciable, and notes that the Judiciary will continue to “safeguard and protect the procedural due process [rights] of Tribal elected officials in removal cases.” Lewis, SU 06-07, 7 Am. Tribal Law at 46, 2007 WL 5256874. Political questions are typically not divided. The Court reasoned that no judicially-manageable standards exist, however former Chief Judge Mark D. Butterfield previously defined the term “malfeasance” in dicta. See infra pp. 91-92. Another important question is that if it is determined that “malfeasance” constitutes a political question, then how is the Judiciary able to determine what is a reasonable notice or reasonable opportunity to be heard?
The presidential removal provision appears in its entirety as follows: “[t]he General Council may remove the President for malfeasance. No vote by the General Council to remove the President shall take place before such President has been given reasonable notice of the impending action and has had a reasonable opportunity to be heard.” HCN Const., Art. IX, § 2. As stated, the General Council must ensure that a president receives reasonable notice and opportunity to be heard in the first instance, just as it must ensure the commission of malfeasance in office in the first instance. However, while the Court may review the former determination for adherence with due process principles, it cannot review the latter determination for adherence with equal protection principles. Any logical rationale for this distinction appears elusive.
The Supreme Court has equated the reasonable notice and opportunity to be heard language with the provision of procedural due process, and has not delineated any difference between the two constitutional clauses. See LoneTree, SU 00-16 at 6-7 (concluding that the manner in which the General Council permitted the President to be heard did not offend the Due Process Clause). Unfortunately, nowhere has the Supreme Court offered an explanation justifying the seeming constitutional redundancy of the provisions. The Bill of Rights already prohibits the Nation from “deprivefing] any person of ... property without the due process of law.” HCN Const., Art. X, § 1(a)(8). So, why would the constitutional framers include a more specific constitutional provision for purposes of presidential removal if intended to provide identical protection? Furthermore, what entitles the Judiciary to intrude into the sphere of the General Council in order to evaluate its adherence with these particular constitutional safeguards and not others? The answer: the HCN Constitution itself. HCN Const., Arts. IV, § 2, VII, § 4.
The constitutional text does not impart sole authority upon the General Council to assess compliance with or define the meaning of the reasonable notice and opportunity to be heard provision, and the Supreme Court has expressly retained judicial authority to determine compliance with the dictates of due process. To be sure, the General Council should make an initial determination, but the provision in question does not on its face exclude judicial review. Likewise, the constitutional text does not impart sole authority upon the General Council to define the meaning of malfeasance, and does not on its face exclude judicial review. However, in this instance, the Supreme Court appears quite comfortable with malfeasance possessing a malleable definition or no definition at all. This decision lies within the sole province of the General Council. Lewis, SU 06-07, 7 Am. Tribal Law at 45, 2007 WL 5256874.
*96 The Supreme Court has seemingly accepted defendant Deeorah’s constitutional interpretation as follows: “[i]f the General Council wants to define malfeasance, fine, they have the authority to define malfeasance; if they want to ehange it, they have the authority to change it; if they don’t want to define it, fine.” LPER at 8, 11:16:09 CST. The problem with such a framework is obvious, and equal protection concerns abound. Essentially, the General Council has license to arbitrarily interpret and apply a constitutional power with no condition of consistency. And, the Judiciary can no longer serve its defined constitutional role as a check upon such governmental action. “Arbitrary and irrational discrimination violates the Equal Protection Clause under even [the] most deferential standard of review,” but the appellate decision invites just this manner of discriminatory application with no apparent recourse. Bankers Life & Cas. Co. v. Crenshaw, 486 U.S. 71, 83, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988).
The Court has identified this potential problem before. In LoneTree, the Court did indicate that “malfeasance is what the collective membership at General Council says it is,” but only “so long as that is not completely arbitrary and capricious.” LoneTree, CV 00-105 at 11. In other words, the allegations of malfeasance had to represent, at an absolute minimum, wrongful conduct. The Court fully intended to perform this basic inquiry at trial in the case at bar, but the Supreme Court rebuffed the Trial Court for “substituting its judgment as to what constituted malfeasance.” Lewis, SU 06-07, 7 Am. Tribal Law at 47, 2007 WL 5256874.
The removal of even the most deferential level of judicial scrutiny of a General Council malfeasance determination represents a departure from prior case law. However, one can trace the genesis of this hands off approach to the 2000 LoneTree decision. Therein, the Trial Court compared the Ho-Chunk presidential removal provision to the senatorial impeachment provision appearing in the United States Constitution. The Court remarked that the Senate’s determination of what constitutes an impeachable offense is in practice “whatever the Senate finds it to be.” LoneTree, CV 00-105 at 11. As evidence of the flexible standard, the Court noted that “the U.S. House of Representatives had a different interpretation of what a ‘high crime and misdemeanor’ was than did the U.S. Senate in the impeachment trial of President William Jefferson Clinton.” Id. (quoting U.S. Const., art. II, § 4).
This comparison recently resurfaced in the Lewis appellate decision, wherein the Supreme Court declared that the General Council removal process “is almost exactly analogous with the U.S. Senate being given the authority to decide whether the President has committed a high crime or misdemeanor pursuant to the U.S. Constitution.” Lewis, SU06-07, 7 Am. Tribal Law at 45, 2007 WL 5256874. The Court stressed the seeming similarity between the constitutional texts, commenting that “[n]o where [sic] is ‘high crime or misdemeanor’ defined in the U.S. Constitution” just as “no where [sic ] is malfeasance defined in the HCN Constitution.” Id. This similarity, however, diminishes upon more in depth review of the relevant constitutional language.
The U.S. Constitution confers upon the Senate “the sole Power to try all Impeachments.” U.S. Const., art. I, § 3(6) (emphasis added). Similarly, the House of Representatives maintains “the sole Power of Impeachment.” U.S. Const., art. I, § 2(5) (emphasis added). Therefore, the House may institute a case against a sitting president after determining probable cause of official wrongdoing, and, through *97 designated managers, present the matter before the Senate, which assumes a quasi-judicial role in hearing and deliberating the charges. Consequently, differing interpretations of high crimes and misdemeanors between the House and Senate resemble the often expected and understandable differing interpretations of criminal charges between a grand jury and a court.
As the quoted passages highlight, the constitutional framers imparted sole authority upon the Congress to determine impeachment. The text excludes judicial review particularly in view of the vague delegation of authority to the federal judiciary. “The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may ... establish.” U.S. Const., art. III, § 1. A plain reading of the U.S. Constitution reveals that the “judicial Power” cannot logically include jurisdiction over matters solely committed to the legislative branch. Furthermore, the constitutional framers explicitly distinguished impeachment from a judicial criminal trial, requiring that “[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury.” U.S. Const., art. III, § 2(3).
In this regard, an impeachable offense does not necessarily need to strictly correspond with a criminal offense. George Mason (1725-1792), for example, commented that impeachment served the purpose of preventing “great and dangerous offenses” arising from “attempts to subvert the Constitution.” The Records of the Federal Convention of 1787, 2 Records 550 (M. Farrand ed,1911). Specifically, “[t]he President ... shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.” U.S. Const., art. II, § 4. Treason is defined in the U.S. Constitution as “levying War against [the United States], or in adhering to their Enemies, giving them Aid and Comfort.” U.S. Const., art. III, § 3(1). Bribery is not similarly defined, but susceptible of a well-understood meaning. The constitutional framers also refrained from defining “high Crimes and Misdemeanors,” but the usage of the modifying word, “other,” denotes an equivalent stature to treason and bribery. “[Statements sometimes heard to the effect that an impeachable offense is whatever the House and Senate say it is are true only in the most cynical and constitutionally faithless sense.” Laurence H. Tribe, Defining “High Crimes and Misdemeanors”: Basic Principles, 67 Geo. Wash. L.Rev. 712, 714 (1999).
The great import accorded presidential impeachment is reflected in the vast procedural protections afforded to the chief executive. Beginning with the constitutional text, “[w]hen the President of the United States is tried, the Chief Justice [of the Supreme Court] shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present! ]” who “shall be on Oath or Affirmation.” U.S. Const., art. I, § 3(6). The Chief Justice, as presiding officer, “shall have the power to make and issue ... all orders, mandates, writs, and precepts,” and entertains, in the first instance, senatorial motions and questions to parties and witnesses, which must be submitted in writing. Senate Impeachment Rules V, XIX. Additionally, “[a]ll motions, objections, requests, or applications whether relating to the procedure of the Senate or relating immediately to the trial ... made by the parties or their counsel shall be addressed to the Presiding Officer only....” Senate Impeachment Rule XVI. The Senate has essentially sought to ensure procedural regularity by further conferring presumptive authority upon the country’s primary judicial officer.
*98 Yet, the unmistakable attention paid to procedure, including sufficiency of the charges and resulting notice, begins in the House of Representatives. Since 1813, the House Judiciary Committee generally has conducted an investigation on impeachable matters, which proceed to it through various avenues. The Judiciary Committee adopted the practice a century later whereby it simultaneously issues an impeachment resolution and articles of impeachment. Thereafter, the House of Representatives votes to accept the resolution by typically determining whether probable cause exists to warrant presenting the case at the bar of the Senate. If accepted, legislative members supportive of impeachment are appointed as managers to try the case.
The Senate will afford a president the ability to file an answer to the articles of impeachment within the timeframe indicated in an issued writ of summons. Also, parties may usually file briefs in support of their pleadings after opening statements and introduction of witnesses in the Senate. See Senate Impeachment Rule XIX. Each party may direct questions to a witness, including senators, who may appear by virtue of Senate subpoena. Senate Impeachment Rules VI, XVII, XVIII. Concerning ease presentation, “[a]ll preliminary and interlocutory questions, and all motions, shall be argued for not exceeding one hour on each side, unless the Senate shall, by order, extend the time.” Senate Impeachment Rule XXI.
To conclude, “[t]he final argument on the merits may be made by two persons on each side....” Senate Impeachment Rule XXII. The Senate then proceeds to voting with “yeas and nays ... taken on eaeh article of impeachment separately.” Senate Impeachment Rule XXIII. The foregoing abbreviated overview certainly affords the president due process, rendering any question of judicial review on this limited issue wholly unnecessary.[1]
By contrast, the Ho-Chunk presidential removal provision does not include express language capable of imparting sole authority to the General Council to interpret said provision. Moreover, the Ho-Chunk Nation Judiciary does not function under an ambiguous grant of constitutional authority, but rather maintains explicit “power to interpret and apply the Constitution.” HCN Const., Art. VII, § 4. This language coupled with the fact that the General Council cannot “review and reverse decisions of the Judiciary which interpret th[e] Constitution” appears to lead to an inevitable conclusion, albeit a conclusion that the Supreme Court has now firmly discounted. HCN Const., Art. IV, § 3(d). The Trial Court should prove imminently capable of and responsible for offering a definition of malfeasance for purposes of maintaining the minimum threshold.
Oftentimes, General Council advocates seize upon the provision indicating that “[ajctions of the General Council shall be binding” in an effort to bolster an argument. HCN Const., Art. IV, § 3(f). This provision, however, does not infuse a General Council action with any greater power, and likely exists, in part, to clearly legitimize a branch of government without any federal or state analogue. For instance, legislative statutes and resolutions, executive orders and judicial decisions possess binding effect in the absence of comparable language within the respective constitutional articles.
*99 Five (5) days ago, the Supreme Court reiterated that the Judiciary “remain[s] the final authority on legal and Constitutional interpretation.” Lewis, SU 06-07 (HCN S.Ct., Apr. 13, 2007) at 2 n. 3. This note seems all the more surprising in light of the prior appellate ruling. Commentators frequently assert that the federal judiciary does not abdicate its role of “say[ing] what the law is” when it refrains from exercising jurisdiction over a political question. Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60 (1803). In the impeachment context, the courts simply denote that the U.S. Constitution mandates that a co-equal branch of government maintain sole authority over the entire process. The interpretive role has been fulfilled in light of this interpretive deduction.
As indicated herein, however, any analogy between the Ho-Chunk and federal contexts is misplaced. A comparison of the relevant constitutional provisions reveals profound differences, and no comparison exists in relation to the process afforded the presidential incumbents. In over 200 years, the fact that the Senate has never impeached a single president reflects, in part, the sanctity with which it approaches its awesome constitutional duty. Alternatively, the General Council has removed every president elected to a full four-year term since the adoption of the HCN Constitution on November 1, 1994.
Regardless, the Supreme Court still anticipates whether the General Council actions comport with due process analysis. The plaintiff originally argued pro se that he was denied due process of law; however the Court did not find his argument persuasive. See Lewis v. HCN Election Bd. et al., CV 06-109, 6 Am. Tribal Law at 369, 2006 WL 5891105 (HCN Tr. Ct., Dec. 5, 2006). In the Court’s interlocutory judgment, it stated the threshold for a presidential removal required two (2) elements. First, the President must receive reasonable notice of the impending action. Const., Art. IX, § 2. Second, the President must have a reasonable opportunity to be heard. Id, The Court went on to explain:
It is not contested that the plaintiff received the Notice of Intent to Remove from Office twenty-five (25) days before the General Council meeting. Furthermore, the defendant noted that the plaintiff was allowed nearly ten (10) minutes to defend himself against the General Council’s accusations. At the hearing, the plaintiff admitted that he was given approximately ten (10) minutes. Furthermore, the plaintiff notes that he was unable to call witnesses or confront his accusers. However, the plaintiff did not attempt to call witnesses or confront his accusers; the plaintiff instead called the question. Therefore, weighing the evidence at hand and arguments presented, the plaintiff' would not have a reasonable likelihood of success on the merits regarding a denial of due process.
Lewis, 6 Am. Tribal Law at 369, 2006 WL 5891105 (citations omitted).
First, was the plaintiff provided with reasonable notice of impending actions against him? The Court has previously indicated that nine (9) days was insufficient; however ten (10) days was sufficient. Coalition for Fair Gov’t II v. Chloris A. Lowe, Jr. et al, CV 96-22 (HCN Tr. Ct., Sept. 11, 1996) at 33. In this instance, the plaintiff received the Notice of Intent to Remove from Office nearly twenty-five (25) days prior to the General Council. See Defs.’ Br. at 2. Therefore, notice was not argued deficient in the sense of an untimely served notice.[2]
*100 The plaintiff argues that a single member should not be able to serve as a representative of the General Council without prior approval of the General Council. Should a General Council member be able to give an elected official a removal notice for the upcoming annual General Council Meeting? How does the elected official know that the individual was given the authority to speak for the entire General Council for a removal? Should the removal notice come from the General Council as a whole, as an electorate? Previous cases have condoned the possibility that a single individual may provide removal notices. A nearly identical set of circumstances happened in the LoneTree removal. In LoneTree, the plaintiff questioned whether Ms. Gloria J. Visitin, as a Ho-Chunk tribal member, had the authority to represent the General Council by serving the Notice of Intent to Remo ve. LoneTree., SU 00-16 at 2. The Court noted that the Constitution does not address the manner in which the notice must be provided or accomplished. The Court stated that “Ms. Visin-tin exercised her right as an individual and a voting member of the HCN in initiating the General Council Removal of the President, to redress grievances that she felt constituted malfeasance.” Id. at 3. In this instance, Mr. Funmaker exercised his “right as an individual and a voting member” of the Nation in initiating the General Council Removal of the President. Id. The Court recognizes that the plaintiff wishes to advance the reasoning of then and present Chief Justice Hunter. However, this Court is bound by stare decisis on this matter, and cannot advance the argument of the plaintiff. Thus, the plaintiff received reasonable notice of the impending action.
Second, has the plaintiff had a reasonable opportunity to be heard? In Lon-eTree, the Supreme Court noted that, “[t]his Court agrees with the Trial Court that the HCN constitution [sic ] requires that Mr. LoneTree only be given the opportunity to be heard.” LoneTree, at 6. This statement implies that at a minimum the President needs to be heard.[3] In this case, the plaintiff did receive over ten (10) minutes to present his argument.[4] This analysis is confounded by LoneTree.
At this particular juncture, the Court recognizes that no post-deprivational due process exists because of the Court’s inability to review a non-justieiable issue. Therefore, an extreme amount of pre-de-privational process must exist in the future. The Court cannot find any case law from other jurisdictions on point. However, the Court will look to U.S. Supreme Court decisions, which discuss due process, as well as those of the Trial Court.
The requirements of procedural due process apply only to the deprivation of interests encompassed by the Bill of Rights protection of liberty and property. HCN Const., Art. X, § 1(a)(8). When protected interests are implicated, the right to some kind of prior hearing is para *101 mount. “ ‘The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be “condemned to suffer grievous loss,” ... and depends upon whether the recipient’s interest in avoiding that loss outweighs the governmental interest in summary adjudication.’ ” Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (citations omitted). The Supreme Court also noted in Louder-rnill that “[a]n essential principle of due process is that a deprivation of life, liberty, or property ‘be preceded by notice and opportunity for hearing appropriate to the nature of the case.’ ” Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)) (emphasis added). Further indication that “[a]t some point, a delay in the post-termination hearing would become a constitutional violation.” Id, at 547, 105 S.Ct. 1487. Due process application, as has been noted, depends upon the nature of the interest; the form of due process to be applied is determined by the weight of that interest balanced against the opposing interests. The currently prevailing standard is the formulation appearing in a 1976 opinion. Mathews v. Eldridge, 424 U.S. 319, 339, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
Applying the three-prong test set forth in Mathews, in the context of government employment, the Supreme Court has held that the interest of the employee retaining his job, the governmental interest in the expeditious removal of unsatisfactory employees, and the risk of erroneous termination require some minimum pre-termi-nation notice and opportunity to respond, although there need not be a formal adversarial hearing, followed by a full post-termination hearing, if the employee is successful.[5] Similarly, in Goldberg v. Kelly, the effect of termination of welfare benefits could be “devastating,” a matter of loss of food and shelter, thus mandating a pre-deprivation hearing. The termination of Social Security benefits would be considerably different, inasmuch as they are not based on financial need, and a terminated recipient would be able to apply for welfare. Goldberg v. Kelly, 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Moreover, the determination of ineligibility for Social Security benefits turns upon routine and uncomplicated evaluations of data, reducing the likelihood of error, a likelihood found significant in Goldberg. Finally, the administrative burden and other societal costs involved in giving Social Security recipients a pre-termination hearing would be high. Therefore, a post-termination hearing, with full retroactive restoration of benefits, if the claimant prevails, was found satisfactory. Mathews, 424 U.S. at 349, 96 S.Ct. 893.
Due process does tolerate different forms which are appropriate to the nature of the case. After the determination of the existence of a protected interest at issue, it must be determined what procedure is adequate, which typically requires notice,[6] hearing,[7] an impartial tribunal,[8] *102 confrontation and cross examination,[9] discovery,[10] decision on the record,[11] and counsel.[12] However, when dealing specifically with hearings, the U.S. Supreme Court has stated that “some form of hearing is required before an individual is finally deprived of a property interest.” Mathews, 424 U.S. at 333, 96 S.Ct. 893. The Court has developed a complex analysis to determine if a hearing should precede the deprivation or whether a prompt post-deprivation hearing would be adequate. Generally, where the loss, even temporarily, would be severe or catastrophic, the hearing must come first. Goldberg, 397 U.S. at 264, 90 S.Ct. 1011. However, if a temporary deprivation would be less severe and the opposing interest is important, the hearing may come later. See generally, Arnett, 416 U.S. 134, 94 S.Ct. 1633.
The Court is inclined to review due process in the instant case akin to the only due process cases this Court has reviewed previously. See, e.g., Margaret G. Garvin v. Donald Greengrass, CV 00-10 (HCN Tr. Ct., Mar. 9, 2001). The Supreme Court has determined that a permanent employee maintains a property right in their continued employment, affirming this Court’s line of due process cases.[13] Louella A. *103 Kelty v. Jonette Pettibone and Ann Winneshiek, in their official capacities, SU 99-02 (HCN S.Ct, July 27, 1999) at 2. The Supreme Court recognized the necessity of providing sufficient notice to the employee whenever the Ho-Chunk Nation intends to detrimentally affect this property right. Id., at 3; see also Debra, Knudson v. HCN Trea. Dep’t, SU 98-01 (HCN S.Ct., Dec. 1, 1998) at 3-4.
In Knudson, the Supreme Court specifically stated that the Court did not approve where a party ‘Vas not afforded the opportunity to confront or answer allegations made against her” prior to termination. Id. The 1997 case dealt with termination procedures and different levels, which embodied post-termination protections. The (hurt, however, did not address the appropriate degree of pre or post-termination procedural due process. However, in employment situations, due process requires that the initial burden of an employee removal is never on the employee, but rather the employer.
In this instance, neither the General Council, nor the individual serving notice has a burden to prove the undefined allegations of malfeasance. Previously, post-deprivation due process was allowed after the General Council removal action. At present, the object of removal may only air his or her concerns at the pre-deprivational hearing, i.e., the General Council meeting. Federal and tribal due process principles would dictate a greater degree of procedural protections at the meeting commensurate with the absence of post-deprivation administrative or judicial review. The LoneTree decision effectively eliminates this possibility when it elevates the General Council’s right to establish its own procedures over the individual's right to assert constitutional guarantees. The Supreme Court must address this dilemma in light of its designation of removal for malfeasance as non-justiciable. The barriers erected in LoneTree should likely be dismantled, but the Supreme Court must engage in that effort, if at all.
IT IS THEREFORE ORDERED this Court is bound by stare decisis. The Court finds that the removal of the President fits within the prior procedural safeguards, such as timeliness of the notice and a reasonable opportunity to be heard as interpreted by the Supreme Court.
The parties retain the right to file a timely post judgment motion with this Court in accordance with HCN R. Civ. P. 58, Amendment to or Relief from Judgment or Order. Otherwise, “[a]ny final Judgment, or Order of the Trial Court may be appealed to the Supreme Court. The Appeal must comply with the Rules of Appellate Procedure [hereinafter HCN R.App. P.], specifically Rules of Appellate Procedure, Rule 7, Right of Appeal.” HCN R. Civ. P. 61. The appellant “shall within sixty (60) calendar days after the day such judgment or order was rendered, file with the Supreme Court Clerk, a Notice of Appeal from such judgment or order, together with a filing fee as stated in the appendix or schedule of fees” HCN R.App. P. 7(b)(1). “All subsequent actions of a final Judgment or Trial Court Order must follow the [HCN R.App. P.].” HCN R. Civ. P. 61.
IT IS SO ORDERED this 17th day of April 2007, by the Ho-Chunk Nation Trial Court located in Black River Falls, WI within the sovereign lands of the Ho-Chunk Nation.

. In providing this synopsis, the Court relied upon the scholarly examination of the history of impeachment prepared by Professor Edwin B. Firmage in conjunction with the vacated impeachment of President Richard M. Nixon. Edwin B. Firmage, Removal of the President: Resignation & the Procedural Law of Impeachment, 6 Duke L.J. 1023 (1974).

. The Court is able to determine judicially manageable standards in the instance of de *100 termining that ten (10) days constitutes sufficient notice. How was this able to pass muster as a judicially manageable standard as opposed to defining "malfeasance”?

. The Court recognizes that individual members at the General Council had troubles hearing and seeing monitors. See infra p. 6.

. The Court also heard testimony attesting to the fact that the plaintiff provided a series of documents, which did not appear on the screens for the General Council to view. The plaintiff could not remember whether he had made such a request. However, the Court did not receive any testimony as to whether the secretaries viewed it as their responsibility to project the materials on the screens or whose responsibility it was to manage documentation at the General Council.

. Arnett v. Kennedy, 416 U.S. 134, 170-171, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Justice Powell concurring); Loudermill, 470 U.S. 532, 105 S.Ct. 1487 (discharging a state government employee); FDIC v. Mallen, 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988) (strong public interest in the integrity of the banking industry justifies suspension of in-dieted bank official with no pre-suspension hearing, and with 90-day delay before decision resulting from post-suspension hearing).

. Mullane, 339 U.S. at 314, 70 S.Ct. 652 (stating ‘‘[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circum *102 stances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.”); Goldberg at 268, 90 S.Ct. 1011.

. Boddie v. Connecticut, 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) ("The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.”)

. Goldberg at 271, 90 S.Ct. 1011; Marshall v. Jerrico, 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) (indicating that "ftjhe neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law.... At the same time, it preserves both the appearance and reality of fairness ... by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.")

. Goldberg at 269, 90 S.Ct. 1011 (opining that ‘‘[ijn almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.”); Greene v. McElroy, 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (indicating that where the "evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealously, ” the individual's right to show that it is untrue depends on the rights of confrontation and cross-examination.)

. Greene at 496, 79 S.Ct. 1400.

. Goldberg at 271, 90 S.Ct. 1011.

. Goldberg at 271, 90 S.Ct. 1011.

. The Court confronted and established the requirements of procedural due process in the following decisions: Gary Lonetree, Sr. v. John Holst, as Slot Director, and Ho-Chunk Casino Slot Dept. CV 97-127 (HCN Tr. Ct., Sept 24, 1998) pp. 7-11 aff'd Gary Lonetree, Sr. v. John Holst, as Slot Director, and Ho-Chunk Casino Slot Department, SU 98-07 (HCN S.Ct., Apr. 29, 1999); Vincent Cadotte v. Tris Yellowcloud, Director of Compliance, CV 97-145 (HCN Tr. Ct., Apr. 24, 1998) pp. 6-10; Joan Whitewater v. Millie Decorah, as Finance Director, and Sandy Martin, as Personnel Director, CV 96-88 (HCN Tr. Ct., Jan. 20, 1998) pp. 4-6 aff'd Millie Decorah, as Finance Director of the Ho-Chunk Nation, and Sandy Martin, as Personnel Director v. Joan Whitewater, SU 98-02 (HCN S.Ct., Oct. 26, 1998); Sandra Sliwicki v. Rainbow Casino, Ho-Chunk Nation, CV 96-10 (HCN Tr. Ct, Dec. 9, 1996) pp. 12-18 rev’d on other grounds Sandra Sliwicki v. Rainbow Casino, Ho-Chunk Nation, SU 96-15 (HCN S.Ct., July 20, 1997); Gale S. White v. Department of Personnel, Ho-Chunk Nation, CV 95-17 (HCN Tr. Ct., Oct. 14, 1996) pp. 11-15; Lonnie Simplot, Linda Severson and Carol J. Ravet v. Ho-Chunk Nation Department of Health, CV 95-26, 27 and 96-OS (HCN Tr. Ct, Aug. 29, 1996) pp. 15-19.